NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

---

JERRY J., *Appellant,*

*v.*

DEPARTMENT OF CHILD SAFETY, E.B., *Appellees.*

No. 1 CA-JV 15-0423
FILED 6-30-2016

---

Appeal from the Superior Court in Maricopa County
No.  JD511173
The Honorable Karen O'Connor, Judge

**AFFIRMED**

---

COUNSEL

The Stavris Law Firm, PLLC, Scottsdale
By Alison Stavris
*Counsel for Appellant*

Arizona Attorney General's Office, Mesa
By Michael F. Valenzuela
*Counsel for Appellee*

John L. Grassy Attorney at Law, Scottsdale
By John L. Grassy
*Guardian Ad Litem for E.B.*

_____

**MEMORANDUM DECISION**

Judge Randall M. Howe delivered the decision of the Court, in which Presiding Judge Diane M. Johnsen and Judge Andrew W. Gould joined.

_____

**H O W E**, Judge:

¶1        Jerry J. ("Father") appeals the juvenile court's order terminating his parental rights to E.B., born July 2013, on the ground of 15 months in an out-of-home placement pursuant to court order. For the following reasons, we affirm.

**FACTS AND PROCEDURAL HISTORY**

¶2        Eva A. ("Mother")[1] was incarcerated when she gave birth to E.B. Because of her incarceration, Mother arranged for the baby's maternal grandmother to care for him. Grandmother could not care for the baby, however. After the Department of Child Safety ("Department") made several unsuccessful attempts to contact Grandmother to pick up the baby from the hospital, the Department placed him in a foster home.

¶3        The Department petitioned for dependency, alleging that E.B. was dependent with respect to Mother and John Doe, his unknown father. The Department also informed the juvenile court that because Mother was a member of the Navajo Nation, E.B. was an Indian child as defined by the Indian Child Welfare Act, 25 U.S.C. § 1903(4), and was eligible for membership in the Navajo Nation. The Department also notified the tribe of its rights to participate in the dependency proceedings and to request a transfer of the proceedings to tribal court. The tribe subsequently worked with the Department throughout E.B.'s dependency proceedings.

¶4        While the dependency was pending, the Department located Father, who took a paternity test revealing that he was E.B.'s biological father. The Department thereafter amended the petition, alleging that E.B. was dependent with respect to Father because Father was unable to parent due to abandonment and neglect and due to his mental health. In July 2014,

_____

[1]        Mother is not a party to this appeal, but the juvenile court has adjudicated E.B. a dependent child with respect to Mother and has terminated Mother's parental rights to the child.

the juvenile court adjudicated E.B. a dependent child and set his case plan as family reunification concurrent with severance and adoption.

¶5        That same month, Father was psychologically evaluated. The psychologist diagnosed Father with alcohol dependency, cannabis abuse by history, cocaine abuse by history, dysthymia, severe learning disorder not otherwise specified, cognitive disorder not otherwise specified, and "Mild Mental Retardation vs. Borderline Intellectual Functioning." The psychologist concluded that Father showed "clear evidence of a cognitive disorder and prominent learning disabilities that have been long term with likely exacerbation of his cognitive impairments because of prolonged alcohol abuse." On whether Father had the ability to demonstrate minimally adequate parenting skills, the psychologist opined that Father's intellectual deficits would "continue for a prolonged and indeterminate period of time" and that they were "likely not to be reversible." When asked basic parenting questions, Father "seemed to be confused and had difficulty answering the questions." On whether a child in Father's care would likely be in any risk, the psychologist opined that Father was well-intentioned, but that his cognitive limitations, learning difficulties, and past alcohol dependency were "major barriers to parenting." The psychologist stated that although Father acknowledged that he was E.B.'s father, he "was not a day to day parenting candidate and seemed to know it" and that he "could place his son unintentionally at great risk."

¶6        Because Father was on probation, he participated in services through the adult probation department, including urinalysis testing, substance abuse counseling, mental health services, and parenting classes. From August 2013 to May 2014, Father provided negative urinalysis tests, completed substance abuse treatment, and participated in Alcohol Anonymous meetings and mental health services. From April to December 2014, Father successfully participated in parent-aide services, leading the Department to consult with the psychologist about moving towards family reunification. Despite his opinion about Father's parenting skills, the psychologist recommended that the Department move forward towards family reunification.

¶7        In early 2015, Father had one unsupervised visit with E.B., but because of Father's care of E.B. during that visit, the Department changed Father's visits to partially unsupervised. From April to July 2015 during the partially unsupervised visits, Father engaged in a number of behaviors that caused the Department's concern about the child's safety. On one occasion, the case aide saw Father pushing E.B. in a stroller down a street. Even though the "weather was hot," E.B. wore several layers of clothes and

Father did not have water for the child to drink. On another occasion, E.B. was sick and his doctor recommended over-the-counter medicine to ensure that his fever did not increase. Father refused to buy the medicine, explaining that the child was fine. The case aide explained to Father the risk if E.B.'s fever increased, and Father responded, "[W]ell, I don't have money right now for that."

¶8            On another occasion, Father took E.B. to a child-sized swimming pool, although such a pool was not appropriate for the 2-year-old toddler because of the drowning risk. Even after a case aide explained to Father why the pool was a safety risk, Father responded that the child was fine. On yet another occasion, Father and E.B. were taking out the trash, and Father was "pulling" E.B. "up from his arm." The child "expressed pain" and "started getting agitated." The case aide advised Father not to pick E.B. up by the arm, but Father "tried to demonstrate that he did not pick up [E.B.] [by] one arm but two." Father's action caused the child to cry.

¶9            In July 2015, because of the Department's safety concerns, it requested that the case plan be changed to severance and adoption; the juvenile court granted the request. The Department petitioned for termination of Father's parental rights on the ground of 15 months in an out-of-home placement. In the months leading up to the severance hearing, Father's case aide reported that he would arrive at the visits under the influence of alcohol. One month before the severance hearing, Father twice tested positive for alcohol.

¶10            At the severance hearing, the case manager testified that during Father's partially unsupervised visits, case aides tried to redirect Father when he was posing a risk to E.B. and explain why he was putting the child at risk, but Father was unable "to grasp what [they] were trying to tell him, and he would seem to understand but then at the next visit, concerns would continue to come up." As for the child's best interests, the case manager testified that an adoptive home had been identified for the child, the child was adoptable, his foster family was meeting all his needs, and the child had developed a bond with his foster family. The case manager also testified that the child had been in his foster family's care for over two years and that the child had special needs, which the family had been taking care of. The case manager opined that E.B. would benefit from the severance because he would be able to be adopted and be provided a safe, secure, and permanent home.

¶11            Based on the evidence presented at the hearing, the juvenile court terminated Father's parental rights on the ground of 15 months in an

4

out-of-home placement and found that termination was in the child's best interests. Father timely appealed.

## DISCUSSION

### 1. Termination of Parental Rights

¶12 Father argues that insufficient evidence supports the juvenile court's order terminating his parental rights to E.B. We review a juvenile court's termination order for an abuse of discretion. *E.R. v. Dep't of Child Safety*, 237 Ariz. 56, 58 ¶ 9, 344 P.3d 842, 844 (App. 2015). We accept the juvenile court's factual findings unless no reasonable evidence supports those findings, and we will affirm a severance order unless it is clearly erroneous. *Bobby G. v. Ariz. Dep't of Econ. Sec.*, 219 Ariz. 506, 508 ¶ 1, 200 P.3d 1003, 1005 (App. 2008). Here, sufficient evidence supports termination on the ground of 15 months in an out-of-home placement.

¶13 As pertinent here, to terminate parental rights for time in an out-of-home placement, the juvenile court must find by clear and convincing evidence that (1) the child has been in an out-of-home placement for a cumulative total period of 15 months or longer pursuant to court order; (2) the parent has been unable to remedy the circumstances that caused the child to be in an out-of-home placement; and (3) a substantial likelihood exists that the parent will be incapable of exercising proper and effective parental care and control in the near future. A.R.S. § 8–533(B)(8)(c); *Kent K. v. Bobby M.*, 210 Ariz. 279, 284 ¶ 22, 110 P.3d 1013, 1018 (2005).

¶14 Father only challenges the juvenile court's finding that a substantial likelihood exists that he will be incapable of exercising proper and effective parental care and control in the near future. But sufficient evidence supports the juvenile court's termination order because, although Father completed all the offered services, he failed to make the necessary behavioral changes that would allow for family reunification. The record shows that Father was successful during the supervised visits, but when left to his own accord, Father was unable to provide for the child's basic needs and engaged in unsafe behaviors putting the child at risk.

¶15 For example, when E.B. was sick, Father did not give the child medicine, against doctor's orders. When Father was taking out the trash, he carried the child by the child's arm, causing the child pain. When redirected by a case aide, Father argued with the case aide, defending his actions and making E.B. cry. Father also took the toddler to a swimming pool that posed a drowning risk. Father also inappropriately dressed the child for hot weather during their stroll down the street and did not have water for him.

The case aides repeatedly redirected Father and tried to explain to him how he was putting the child at risk, but Father either brushed their warnings aside or argued with them, denying that he was putting the child at risk. Moreover, even though Father would first indicate that he understood the case aides' explanation, he would revert to his previous behavior in a subsequent visit. Consequently, Father has been unable to change his behavior to show that he would be capable of exercising effective care and control of E.B. in the foreseeable future. Accordingly, the juvenile court did not err in terminating Father's parental rights on the ground of 15 months in an out-of-home placement.

## 2. Child's Best Interests

¶16 Father also argues that insufficient evidence supports the juvenile court's finding that termination was in E.B.'s best interests. A finding of one of the statutory grounds for severance under A.R.S. § 8–533, standing alone, does not permit termination of parental rights; severance must also be in the child's best interests. A.R.S. § 8–533(B). Severance of parental rights is in the child's best interests if the child would either benefit from the termination or be harmed by the continuation of the parent-child relationship. *Id.* In determining whether the child would benefit, relevant factors include whether the placement is meeting the child's needs, an adoption plan is in place, and the child's adoptability. *See Tina T. v. Dep't of Child Safety*, 236 Ariz. 295, 300 ¶ 19, 339 P.3d 1040, 1045 (App. 2014); *Mario G. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 282, 288 ¶ 26, 257 P.3d 1162, 1168 (App. 2011). The juvenile court need only find by a preponderance of the evidence that termination is in the child's best interests. *Kent K.*, 210 Ariz. at 288 ¶ 41, 110 P.3d at 1022.

¶17 Here, termination was in E.B.'s best interests. Although Father argues that he and the child have bonded and that the child loves him, the record shows that the child would benefit from termination. Father's case manager testified that an adoptive home had been identified for the child, and if that placement did not follow through, the child was nonetheless adoptable. The case manager also testified that the child had been with his foster family since birth and that the foster family would be his adoptive home. The case manager further testified that the foster family was meeting all the child's needs, including his special needs, and that the child had bonded with them and them with him. Consequently, the record shows that E.B. would benefit from termination. Accordingly, sufficient evidence supports the juvenile court's order terminating Father's parental rights and finding that termination was in the child's best interests.

## CONCLUSION

¶18        For the foregoing reasons, we affirm.



Ruth A. Willingham · Clerk of the Court
FILED: AA